# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

IN RE                                    )
                                         )        **Case No. 11-21158-TLM**
**JAMES P. MAREK and**                   )
**CARRIE A. MAREK,**                     )        **Chapter 12**
                                         )
            **Debtors.**                 )
_____          )

## MEMORANDUM OF DECISION
_____

## INTRODUCTION

Pending before the Court in this Chapter 12 case of James A. Marek and

Carrie A. Marek ("Debtors") is a motion to dismiss brought under § 1208(c).[1]

That motion is brought by creditor Killgore Adventures, LLC ("Killgore") and

joined in and supported by creditor Nick Troche ("Troche") (collectively

"Creditors"). This motion was heard at a properly noticed evidentiary hearing. At

that same hearing, evidence was presented by Debtors in support of confirmation

of their amended chapter 12 plan, and by Creditors in support of their objections to

confirmation. That hearing occurred on May 8, 2012. All issues were taken under

advisement after oral argument on May 16, 2012.

_____

[1]  Unless otherwise indicated, all statutory references to chapter and section are to the
Bankruptcy Code, Title 11, U.S. Code, §§ 101-1532, and all rule references are to the Federal
Rules of Bankruptcy Procedure.

MEMORANDUM OF DECISION - 1

This Decision constitutes the Court's findings of fact and conclusions of law as to all such matters under Rules 7052 and 9014.[2]

## BACKGROUND AND FACTS

### A.    Procedural background and record

Debtors filed a voluntary joint chapter 12 petition on September 2, 2011, asserting they were "family farmers" entitled to proceed under that chapter.  *See* § 109(f).[3]

### 1.    Initial September filings

#### a.    Assets and liabilities

In Debtors' original September 21, 2011 schedules, they listed total assets of $145,371.00 and total liabilities of $391,874.95.  Their real property assets consist of 10 acres of real property in Idaho County which they valued at $70,000.  That real property secures the claim of Troche, which was estimated in Debtors' schedule D at $149,999.[4]

Debtors' scheduled personal property assets were minimal.  They did disclose a pickup truck, a Peterbilt tractor, and a livestock trailer, collectively

---

[2]  The Court has jurisdiction pursuant to 28 U.S.C. § 1334, and all issues before it are core matters on which it may enter final decision under 28 U.S.C. § 157.

[3]  Section 109(f) provides: "Only a family farmer or a family fisherman with regular annual income may be a debtor under chapter 12 of this title."

[4]  Troche filed an original and amended proof of claim, Exs. 301, 302, asserting a total claim of $191,268.24.

MEMORANDUM OF DECISION - 2

worth $66,000.  They listed no other equipment or machinery used in business, no

farming equipment or implements, no farm supplies or feed, and no livestock

("animals").[5]

### b.    Income and expenses

Notwithstanding the lack of any livestock in their schedule B, Debtors'

schedule I stated their employment or occupation is "cattle raising" and asserted

their "employer" is YO Livestock, LLC.[6]

Schedule I showed no current monthly income for Debtors.  Schedule J

listed total monthly expenses of $21,271.00, including $15,000.00 for "regular

expenses from operation of a business, profession, or farm."  Though schedule J

---

[5]  In response to question 14 on the statement of financial affairs ("SOFA"), Debtors
indicated that Peggy Marek (established by testimony at hearing to be Mr. Marek's mother)
owned a stock trailer, arena panels, a tractor, horses, and a 4-wheeler, all of which were in
Debtors' possession.  Ex. 200.

[6]  In the SOFA, Debtors disclose an ownership interest in the entity, YO Livestock, LLC,
and allege its dates of operation as "1999 to current."  Mrs. Marek acknowledged in testimony
that Debtors "owned it."  The monthly operating reports filed by Debtors during this chapter 12
case do not address this separate entity.  However, bank records introduced by Debtors, Exs. 112,
113, show the named holder of that bank account as "Y.O. Livestock LLC."  (Similar bank
records were also attached to Debtors' monthly operating reports, Exs. 103-107.)  In their Rule
2004 examination testimony, *see* Ex. 218, Debtors explained that their limited liability company
was formed with advice of an accountant in an attempt to separate or segregate business finances
from personal.  It appears that effort was at some point effectively abandoned.  For example, all
tax returns placed into evidence are for Debtors personally, and none reference YO Livestock,
LLC with the exception of Ex. 109, a May, 2012 amended 2010 return, that mentions the LLC in
a workpaper attachment related to its schedule F, lines 4 and 10.  *Id.* at form 4562.  In attempting
to evaluate the ambiguity surrounding the entity, the Court viewed the public records of the Idaho
Secretary of State, *see* Fed. R. Evid. 201, and found that Y.O. Livestock, LLC was formed in
2009, with Mr. Marek as registered agent, and administratively dissolved in June 2010.  On the
weight of the evidence, the Court concludes Debtors are self-employed, as individuals, and at best
use YO Livestock, irregularly, as a business name.  (Were it otherwise, reorganization would
need to be pursued by YO Livestock, LLC; *see* § 101(18)(B) (addressing farming operation
conducted through and by entities)).

MEMORANDUM OF DECISION - 3

calls for the attachment of a detailed statement for such declared expenses, none was attached.[7]

Debtors' SOFA alleged gross income for the year 2011 (up to the date of filing the petition) of $60,000; for 2010 of $210,000; and for 2009 of $236,978. Ex. 200 at SOFA, question 1. The income in all three years was characterized as coming from "Both Cattle sales and trucking."

## 2.      October amended filings

On October 4, 2011, Debtors filed amendments to their schedules. Ex. 201. An amended schedule I showed monthly "projected" income for Mr. Marek of $2,542, derived from "livestock sales," though it asserts this "[i]ncome totally depends on market for cattle, sheep, goats, and cost of fuel and feed." Schedule J was also amended. Though this schedule showed "$0.00" for both installment payments and for "expenses from operation of business, profession or farm," an attachment to schedule I and J was a statement labeled "Jim and Carrie Marek – Projected Income/Expense 2011." This statement showed an estimated annual gross income of $120,000 from "livestock sales" and estimated annual expenses of $89,500, leaving net annual income of $30,500.[8] This attachment also stated

---

[7] The only detail attached addressed the $3,650 per month installment payments Debtors were obligated to make on the pickup, Peterbilt, and livestock trailer.

[8] Instead of calculating the effective gross monthly income by taking all irregular livestock sales occurring over the course of a year and adding other annual income (*e.g.*, trucking), dividing by 12 and including it on schedule I, and similarly showing the effective

(continued...)

MEMORANDUM OF DECISION - 4

"Debtors are no longer operating a longhorn cattle business. Debtors currently buy and sell cattle, goats and sheep, raise them to marketable size and resell them." There were no amendments to schedule B, thus still indicating no livestock was owned as of the petition date. The "livestock sales" in the 2011 projections, therefore, would be entirely post-petition acquisitions, and subsequent sales, of animals.[9]

The October, 2011, amended SOFA again asserted $60,000 in 2011 YTD (*i.e.*, pre-September 2, 2011) gross income, and $236,978 in 2009 gross income. But it lowered the 2010 gross income from $210,000 to $49,654 and noted this figure was "REVISED PER 2010 INCOME TAX RETURN."[10] The Court will return to issues related to the tax returns later in this Decision.

### 3.   Killgore adversary proceeding, and first motion to dismiss

On December 5, 2011, Killgore filed a complaint commencing Adv. No. 11-07035-TLM. In that action, Killgore sought a determination that a debt,

---

[8](...continued)
monthly expenses on schedule J, Debtors calculated an alleged annual net income of $30,500 which, when divided by 12, was $2,542 – the figure they inserted on schedule I, and they omitted the business expenses from schedule J.

[9]   These schedule amendments also dropped the declared fair market value of the 10 acres of ground securing Troche from $70,000 to $20,000. Ultimately, Debtors resolved a valuation dispute with Troche by agreeing with the fair market value figure of $100,000 reached by Troche's appraiser. Ex. 303. Such agreement was evidenced in Debtors' May 3, 2012 amended plan, and a brief, Doc. No. 90, filed May 4.

[10]   The $49,654 figure is found in Debtors' 2010 tax return. *See* Ex. 208 at schedule C, "Profit or Loss from Business (Sole Proprietorship)." The return shows a date of preparation of September 15, 2011. The source for or reasoning behind Debtors' assertion of a gross income over $160,000 higher just one month before was never provided.

MEMORANDUM OF DECISION - 5

established by an Idaho state court decision in May, 2011 and judgment in August, 2011, was nondischargeable under § 523(a)(2)(A).[11]  The gravamen of the claim was that Debtors had made misrepresentations and committed fraud in connection with the purchase and sale of, and related transactions regarding, certain longhorn cattle in 2006-2009.  In February, 2012, this Court agreed, granting judgment in favor of Killgore for a $48,255 nondischargeable debt.

On December 21, 2011, Killgore filed a motion under § 1208(c)(3), seeking to dismiss Debtors' chapter 12 case for "cause" on the basis that Debtors had failed to file a proposed chapter 12 plan within the time required under § 1221.[12]  Doc. No. 34.  Killgore did not set this matter for hearing.[13]

### 4.    December amendments, and first chapter 12 plan

On December 23, 2012, Debtors filed additional amendments to schedules B, D, F and G.  Ex. 202.  They added a Toyota vehicle and a related secured claim, added a number of additional unsecured creditors, and disclosed a "residential lease, including storage areas for Debtors' equipment and animals"

---

[11]   *See* Adv. No. 11-07035-TLM at Doc. Nos. 13-1, 13-2.

[12]   Section 1221 provides: "The debtor shall file a plan not later than 90 days after the order for relief under this chapter, except that the court may extend such period if the need for an extension is attributable to circumstances for which the debtor should not justly be held accountable."  Section 1208(c)(3) lists, as one of the nonexclusive grounds constituting "cause" for dismissal, the "failure to file a plan timely under section 1221 of this title."

[13]   Under LBR 2002.2, movants are to either obtain a hearing date from the Court and issue a notice of hearing, or issue a notice advising adverse parties of their right to object and to request and schedule a hearing ("negative notice").  In regard to the first motion to dismiss, Killgore did neither.

MEMORANDUM OF DECISION - 6

with Mr. Marek's mother, Peggy Marek.

Also on December 23, Debtors' first chapter 12 plan was filed.  Ex. 211.

This date was more than 90 days after the filing of the petition for relief on

September 2, 2011.  Debtors did not request an extension of the § 1221 deadline

for plan filing.  However, through yet another filing on December 23

(characterized as an "objection" to Killgore's motion to dismiss), Debtors argued

that § 1208(c)(3) was not automatic but required proof of prejudice to the moving

creditor.  *See* Doc. No. 38.  Debtors also contended that the chapter 12 trustee had

agreed Debtors could have until December 21 to file the plan.  *Id.*[14]  Debtors

issued a notice setting this plan for a confirmation hearing on February 7, 2012.

### 5.  Rule 2004 Examination

A Rule 2004 examination of Debtors was scheduled for January 20, 2012,

based upon a January 10, 2012, stipulation of Debtors and Killgore.  That

stipulation, Ex. 203, required Debtors' production of numerous documents at such

examination, as did the Court's Order approving the stipulation, Ex. 204.  Those

documents included: copies of all receipts and other evidence of payments

received for the sale of livestock in 2008, 2009 and 2010; copies of all vehicle

titles; copies of all leases or contracts for real or personal property; copies of all

---

[14]  No authority was cited in this "objection" for the proposition that "prejudice" was a
required element under § 1208(c)(3), nor was any provided to support the idea that a chapter 12
trustee could modify or extend the § 1221 statutory deadline, or waive the Code's requirement
that the Court grant any extension.  *See also* discussion *infra*.

MEMORANDUM OF DECISION - 7

documents relied on by Debtors to support projected income or expenses for 2011; copies of all documents related to the formation, operation and/or dissolution of YO Livestock, LLC; and copies of all agreements between Debtors and YO Livestock, LLC.  *See* Ex. 203 at 2.

However, few documents were provided at the examination, and the compliance with this aspect of the stipulation and order was the subject of much discussion at that January 20 examination.  *See generally* Ex. 218 (transcript).[15]

### 6.    Objections, initial hearing, and amendments

Killgore, Troche, and the chapter 12 Trustee, Ford Elsaesser ("Trustee") all filed objections to confirmation of Debtors' proposed plan.  Virtually all § 1225 requirements for confirmation were challenged to some extent.  Included among these was a contention that Debtors were not eligible under § 109(f) to be chapter 12 debtors and, thus, could not satisfy the confirmation standards of § 1225(a)(1).[16]

Two days before the scheduled hearing, Debtors filed a "response" to the confirmation objections, acknowledging that several serious issues were raised by Creditors and Trustee which would necessitate an evidentiary hearing.  In this response, Debtors also requested that confirmation be denied with leave to file an

---

[15]  Inasmuch as the documents, both those provided and those not produced, were also the subject of significant testimony at hearing, the details are addressed later in this Decision.

[16]  Section 1225(a)(1) requires debtors to prove the plan "complies with the provisions of this chapter and with the other applicable provisions of this title."

MEMORANDUM OF DECISION - 8

amended plan.

At the hearing on February 7, 2012, the Court denied confirmation of the plan; ordered an amended plan filed by March 19; and set a confirmation hearing on such amended plan for May 8-10, 2012, with appropriate pre-hearing deadlines for the disclosure of proposed exhibits and witnesses and the filing of briefs. Doc. No. 51 (minute entry).

Additionally, Killgore commented on its first motion to dismiss at that hearing. Killgore noted that it had not set that motion for hearing because it elected to see first what information was adduced at the Rule 2004 examination. It stated that it would file another, supplemental motion to dismiss, again raising the § 1208(c)(3) issue as to the late filing of Debtors' plan as well as other grounds. The Court instructed the parties that all dismissal issues would be heard at one time, and that would also be on May 8.

Debtors filed an amended plan on March 13. Ex. 212. Killgore on March 21 filed a "Second Motion to Dismiss," Doc. No. 57 ("Dismissal Motion"). Killgore set the Dismissal Motion for hearing at the same time as confirmation on May 8.

Trustee objected to confirmation on April 12. Killgore on April 24 filed an amended objection to confirmation, as did Troche. In an April 25 submission, Trustee continued to voice objections to confirmation, though suggesting Debtors be allowed to address certain issues in a further amended plan or possibly in an

MEMORANDUM OF DECISION - 9

agreed, appropriately detailed confirmation order.

On May 3, just five days before the commencement of the confirmation hearing on the March 13 plan, Debtors filed yet another amended plan, Doc. No. 83, as well as a notice asserting that a confirmation hearing on it would take place May 8.[17]  Killgore replied with a renewed objection, and Trustee filed a May 7 report identifying confirmation impediments (primarily regarding feasibility, Trustee having now had an opportunity to review several months of Debtors' operating reports, Exs. 103-107, all filed on May 2) and retracting his prior suggestions about allowing amended plans or addressing issues in a confirmation order.

### B.    Hearing on the Dismissal Motion and on plan confirmation

Hearing was held on May 8.  The parties were allowed to consolidate presentation of all evidence whether related to the Dismissal Motion, confirmation of Debtors' plan(s), or both.  Debtors were the sole witnesses examined at the hearing.[18]

### 1.    Debtors' prebankruptcy business operations

Debtors acknowledged they once were but are "no longer" in the longhorn

---

[17]  *But see* Fed. R. Bankr. P. 2002(a)(8) (requiring 21 days notice of hearing on confirmation of chapter 12 plan).

[18]  Whether highlighted or not, all references of the Court to testimony of Debtors incorporate the Court's evaluations of credibility, where implicated, and of the weight to be given the testimonial assertions.

MEMORANDUM OF DECISION - 10

cattle business.  *See* Ex. 201 (October 2011 attachment to amended schedule I).

Mr. Marek testified that Debtors' business in 2009 was "mostly cattle" raised on

"leased ground."[19]  He stated that, in 2010, Debtors' business changed to raising

both cattle and sheep.  Mr. Marek further testified that in pre-bankruptcy 2011 the

cattle and sheep that he raised were both those "owned" by Debtors and those he

raised "on share."

　　　This last phrase (or variations thereof) was later explained as meaning

Debtors would obtain physical possession of livestock owned by others, would

pasture and feed the same and provide any necessary labor for their care, and then

receive, in compensation for their services and expenditures, 70% of the "gain" on

the ultimate sale of these animals or their offspring.  That would be Debtors'

"share" or "share of the gain," and the actual owner of the livestock would receive

30% of the "gain."  The "gain" would result from additional weight the animals

would add over the term of Debtors' care and feeding if they were sold, and from

the creation and sale of offspring.  The livestock would be sold on the open market

at times and locations Debtors selected as providing optimum prices.[20]

---

[19]  Mr. Marek further testified that Debtors still had this same leased ground at the time
of the bankruptcy filing.  There was, however, no leased ground shown on Debtors' schedule G.
The December, 2011, amendments included an amended schedule G disclosing a "residential
lease including storage areas for Debtors' equipment and animals" with Peggy Marek.  Ex. 202.
Under cross-examination, Mr. Marek appeared to indicate this was the "leased ground" on which
the cattle were raised, though the situation was not adequately explained.

[20]  This "share of the gain" was also the method by which Debtors operated post-petition.
All such arrangements, pre- and post-bankruptcy, were oral, at least until a May 1, 2012, "share

(continued...)

MEMORANDUM OF DECISION - 11

Debtors acknowledge they also generated income, prior to filing, from trucking livestock for other individuals and businesses. They concede that such "trucking income" would not be considered income from a "farming operation" for purposes of chapter 12 eligibility.[21]

### 2.    Rule 2004 examination

At the time of the Rule 2004 examination, Debtors produced a single-page document entitled "James and Carrie Marek, 2010-2011 Income Sources." *See* Ex. 218 at attach. 2. In this summary document, Debtors contended they had a total of $61,437.61 in "Ag[ricultural]" income and $18,818.23 in "non-Ag" income in 2010. The document also asserted $173,705.57 in Ag income and $36,967.89 in Non-Ag income in 2011. *Id.*[22]

In addition to this single-page document, Debtors produced at the Rule

---

[20] (...continued)
agreement" between Mr. Marek and Peggy Marek. Ex. 114. Further, other than in regard to Peggy Marek, Debtors refused to identify the owners of the livestock or any others with whom they did business on "share agreements" or any other basis.

[21]    *See* § 101(21) (defining "farming operation"). Debtors appear to argue "trucking income" *would* be income from their farming operation if it involved trucking their own livestock to market. However, Debtors never clearly delineated in their submissions which of the income they labeled as "trucking income" was for their livestock as opposed to hauling animals for others, nor explained how or why the movement of livestock in which they had a "share" interest would result in payment to them of "income" that would be separately reported as such (rather than an expense that would impact their net "share"). And, as discussed further below, the details of the transactions giving rise to all received income were memorialized in a "binder" (or other documents) that Debtors refused to produce.

[22]    Given the issues raised under § 1208(c) and §§ 101(18)(A) and 101(19), focus will be primarily on the 2010 figures. *See* discussion *infra*. As to the 2011 figures, the totals include an alleged $95,352.67 in Ag income received in August, 2011, immediately before the bankruptcy filing, which will also be further addressed.

MEMORANDUM OF DECISION - 12

2004 examination a two-page document summarizing the 2011 income received. *Id.* In this summary, Debtors characterized each of the asserted deposits in a given month of that year; most of the descriptions are "trucking," "sheep sales," "livestock sales," "labor," or "feeding (yardage)." There is a similar two-page document summarizing the 2010 income. *Id.*; *see also* Ex. 111. The totals of these two 2-page documents match the totals on their single-page summary for both years.

Debtors were questioned at the Rule 2004 examination about the source documents used in compiling these summaries. They admitted they did not bring any source documents to the examination (with the exception of some checking account statements) despite the Court Order requiring such production. There were no brand inspections related to the livestock sales, nor receipts or documents of any other kind regarding such sales. There were no bills, invoices or other transaction documents. Debtors at the examination, and again at the hearing, testified that most of the "details" about their transactions – both in regard to trucking and in regard to livestock arrangements and sales – were in a "3-ring binder" or "notebook" that Mr. Marek carried in his pickup truck.[23] That binder

---

[23] Mrs. Marek prepared these income summaries. She testified she relied on the binder for the information contained in those summaries. She essentially stated that she had "dollar figures" from the bank documents, but used Mr. Marek's input and the binder to categorize the same. (This was true not just for the summaries but also for the post-petition monthly operating reports filed with the Court, Exs. 102-107.) But she further testified she had no real knowledge of, and would have to defer to Mr. Marek for, the details of all transactions (number of head sold,

(continued...)

MEMORANDUM OF DECISION - 13

was never produced, despite Creditors' demand.[24]

In addition to the lack of documentation, Debtors both at the Rule 2004 examination and at the May 8 hearing repeatedly refused to answer questions about the individuals or entities with whom they did business. Debtors would not disclose the identity of those (other than Peggy Marek) with whom they had "share" agreements or similar arrangements under which Debtors generated livestock-related income, and similarly refused to identify the parties they leased ground from or for, or those for whom they trucked livestock.

The rationale offered for this refusal was that Killgore had used such information in the past to slander Debtors' reputation or otherwise interfere with Debtors' ability to conduct business, and Debtors feared such conduct would continue. Mrs. Marek could not, at hearing, identify any instance within her personal knowledge where this had occurred, and said she was relying instead on what her husband told her. Mr. Marek testified as to a single instance, in which Mrs. Killgore attended a cattle sale in Oklahoma in 2010 where Mr. Marek was present. He says he heard her talk to a man at such sale and she "was running our [Mareks'] name down." Mr. Marek said that, as a result of hearing this

---

[23] (...continued)
when and where sold, the "yardage" income, details of trucking arrangements, etc.), and she suggested Creditors' counsel direct their questions about these subjects to Mr. Marek. This was so even though she testified that she worked with her husband in all aspects of the operation, "did the books" and was familiar with the summaries and the projections supporting the plan.

[24]  Mrs. Marek also testified that Peggy Marek kept some "files" for Mr. Marek. As with the "binder," no such "file" documents were produced.

MEMORANDUM OF DECISION - 14

conversation, he pulled his cattle from the sale and returned to Idaho.  No other

incident was described.

### 3.     Debtors' tax returns

Debtors' 2010 tax return, Ex. 208, was provided to Debtors with the

preparer's cover letter dated September 15, 2011, about two weeks after the

chapter 12 case was filed.[25]  It reflected $49,654 in gross receipts or sales, and

$40,616 in gross income, on an attached IRS schedule C ("profit or loss from

business (sole proprietorship)").  After expenses, Debtors had a net profit of

$6,507, which was reported as "business income" on line 12 of the return.  The

business or profession on the 2010 schedule C was listed as "trucking &

livestock."  There was no IRS schedule F ("profit or loss from farming").  There

was no reported "farm income (or loss)" on line 18 of the return.  Consistent with

the return, an attached "worksheet" places the $6,507 from schedule C in a "Net

profit or (loss)" line, and there is no amount shown on the worksheet for "Net

*farm* profit or (loss)."  *Id.* (emphasis added).

The 2009 return, Ex. 209, was similar.  It showed $220,978 in gross receipts

or sales and $236,978 in gross income, both on an attached schedule C, which after

expenses rendered a $6,950 net profit that was inserted as "business income" on

line 12 of the return.  There was no schedule F attached nor any reporting of farm

---

[25]   The preparer of the original 2010 tax return was Thompson & Co., PLLC in
Grangeville, Idaho.  *Id.*

income on line 18 of the return.

Debtors' 2008 return is also in evidence. Ex. 210. Unlike the returns for 2009 and 2010, it showed both net business income of $53,581 from a schedule C on line 12 and a net farm loss of -$41,300 from a schedule F on line 18.[26] It is, of course, "gross" income from both farming and nonfarm operations that is critical under § 101(18)(A) of the Code. The 2008 gross income on schedule C is $136,396 and the gross income from farming on schedule F is $47,033.

### a.    Amended 2010 return

At hearing, Debtors introduced an amended return for 2010. Ex. 109.[27] In an agreement with Creditors, Debtors acknowledged that the preparer had or was given the following documents for use in preparing the amended 2010 return: the original 2010 return (*i.e.*, Ex. 208); the Debtor-prepared summary of 2010 income (Ex. 111); and the YO Livestock bank account records (Exs. 112 (for 2010) and 113 (for 2011)). Debtors declined to call the preparer to testify after Ex. 109 was admitted on the parties' agreement as to what underlying documents were provided to the preparer. By virtue of this stipulation, the parties agreed that the preparer was not given copies of any actual transactional documents.

---

[26]  Schedule C shows Mr. Marek's profession as "trucking" while schedule F shows the profession as "cattle & trucking."

[27]  The return introduced into evidence, Ex. 109, shows the signature of the preparer, Jerry Johnson of H&R Block in Grangeville, Idaho, and a date of May 1, 2012. It is not signed by Debtors. However, Mrs. Marek testified that Debtors met with the preparer and signed the amended return two days before the hearing.

MEMORANDUM OF DECISION - 16

Additionally, Mr. Marek expressly testified under cross-examination that the preparer was never given a copy of the "3-ring binder" which detailed the transactions, both in connection with trucking and with raising livestock.[28]

The 2010 amended return, Ex. 109, reflects changes in total 2010 gross income. A new schedule F asserts $46,813 in gross farm income, and an amended schedule C reduces the gross non-farm business income from $40,616 on Ex. 208 to $18,218.[29]

### 4. Aspects of Debtors' asserted 2011 income and expenses

Immediately before the filing of the bankruptcy in September, Debtors received, according to their 2011 income summary, a total of $97,516.67 in August income.[30] Of this amount, $95,352.67 is denoted as "Ag" income and $2,164.00 as "non-Ag" income. In Debtors' break down of the Ag income figure,

---

[28] Given the explicit terms of the stipulation, it appears the preparer, Mr. Johnson, was also not provided copies of the 2009 and 2008 returns, Exs. 209 and 210. Those returns were prepared by Presnell Gage, PLLC, in Lewiston, Idaho.

[29] Reconciling the amended return with the balance of Debtors' documents and assertions is difficult. The non-farm income figure on the amended 2010 return of $18,218 approximates the 2010-2011 summary, Ex. 218 at attach. 2 (asserting $18,818.23 in "non-Ag" income). However, the gross farm income of $46,813 on the amended 2010 return is less than the $61,437.61 in 2010 "Ag" income on the summary. *Id.* For total gross income, the amended return shows $65,031 ($18,218 + $46,813), contrasted with the original return's $40,616 and the summary's $80,255.84 (The summary asserts a 2010 total combined income of $80,284.34, however, there appears to be a math error as $61,437.61 of "Ag" income and $18,818.23 of "non-Ag" income equals $80,255.84). Thus in amending their 2010 return, Debtors appear to not only recharacterize $22,398 of gross non-farm income as farm income, they also disclose $24,415 of additional "income." And Debtors' summary asserts yet an additional $15,224.84 in gross income that is not disclosed at all on Debtors' amended 2010 return. Recall that the tax preparer was not provided the underlying source or transactional documents, and thus was characterizing the nature of income from Debtors' assertions on their summaries.

[30] However, the original September and the amended October, 2011 SOFA's both disclosed a total of only $60,000 of "gross income" in 2011. Exs. 200, 201.

MEMORANDUM OF DECISION - 17

$85,252.30 was a single entry noted as "sheep sales (300 head yearling ewes)." *See* Ex. 218 at attach. 2.

Mrs. Marek was asked about this particular August, 2011, sheep sale entry. She testified that this represented the sales of lambs for the benefit of the owner of the ewes that produced the lambs. She said it was not a 70%-30% "share" arrangement, nor an arrangement with Peggy Marek. She said that Mr. Marek put the "deal" together for another individual, and made a "profit" on the transaction, but that she was unfamiliar with the details or terms of the deal. When Creditors' counsel pointed Mrs. Marek to bank statements for the month of August, 2011, and to a wire deposit into the YO Livestock account of $81,000 on August 2 and a check out of the same account on the very same day for $76,500, she appeared to agree that the difference would be the "profit" to Debtors for Mr. Marek facilitating or arranging the transaction.

Mr. Marek had earlier in the hearing testified briefly as to this $85,252.30 August, 2011 "sheep sales" figure. He stated Debtors did not own these sheep, but he refused to name the owner. He stated the only paperwork ever received by Debtors was the "check" and there were no receipts or any other documents. He said Debtors "kept the profit" on the transaction, and they had held the sheep only "a matter of days." A little later in his initial examination, after again refusing to identify the owner of these sheep or where they were sold, Mr. Marek indicated this $85,252 Debtors showed that they received in the month before filing "went

MEMORANDUM OF DECISION - 18

to pay bills."  He also stated "he had to pay for the ewes," though he said he could not recall the amount he paid.[31]

After Mrs. Marek testified about the August, 2011 sheep sale income shown on the summaries, Mr. Marek was recalled.  He then explained the sale involved 300 head of yearling ewes.  He said he bought those ewes with funds wired to him by "a guy" who he still refused to name (for present purposes, the Court will call this individual the "ewes' owner").  Debtors held the animals "a couple of weeks" and fed or pastured them.  Mr. Marek then sold them for the benefit of the ewes' owner.   The $81,000 received by wire in the YO Livestock bank account was the money wired from the ewes' owner to be used to first acquire the ewes, and the $76,500 check was the payment to the original seller of the ewes.  Mr. Marek was paid effectively as a "middleman" in the transaction, which took either a "matter of days" or "a couple of weeks."  It appears Debtors retained the $4,500 difference as a fee for the service rendered.

The bank documents, Ex. 113, further reflect that the $85,252.30 figure in "sheep sales" on Debtors' summary is a not a single deposit but is an aggregation of "Other Deposits" to the account (*i.e.*, in addition to "Customer Deposits" of $12,264.37) in August 2011.  The $85,252.30 figure includes the $81,000 wire transfer of August 2.  Thus the assertion in Debtors' summaries that they had

---

[31]   The responses to SOFA question 3(b) (payments to creditors within 90 days of filing by debtors whose debts are not primarily consumer debts) in September and October, 2011, *see* Exs. 200, 201, are facially inadequate and certainly do not address the type and magnitude of transfers and payments shown in later summaries and bank records, or in this testimony.

MEMORANDUM OF DECISION - 19

$85,252.30 in "sheep sales" income in August (the same being a very large part of

the total of $95,352.67 in "Ag" income shown for that month) is inaccurate and

grossly overstates farming income.  The testimony and exhibits would instead

indicate that the $81,000 was the provision of funds by the ewes' owner to

initially buy the ewes, and $76,500 was the cost to so acquire the ewes.  These

animals thereafter belonged to the "owner" not Debtors.  Debtors would receive

no income from the animals' later sale.  At best, income of $4,500 was received

for the "middleman" services rendered in arranging the purchase transaction, and

even this would not appear to be farming income to Debtors.[32]

### 5.      Post-bankruptcy operations

As noted, Debtors are caring for sheep (and a few other animals[33]) at the

present time, utilizing the "share" or "share of gain" approach.  Because Debtors'

disclosed real property holdings consist only of the 10 acres secured to Troche,

and the "residential lease" with Peggy Marek, the sheep are held and raised on

---

[32]   Debtors' 2011 tax return, Ex. 110, lists trucking gross receipts and income as $36,968.
*Id.* at schedule C.  It also lists total sales of livestock of $153,337.  *Id.* at schedule F. (This figure
excludes "yardage" of $10,451 which is separately itemized.)  The 2011 income summaries of
Debtors, in Ex. 218 at attach. 2, after excluding all trucking, yardage, and labor and
miscellaneous items, leaves what Debtors characterize as "sheep sales" or other livestock (cattle,
pig) sales totaling $163,255.07.  It appears from the evidence that these figures are likely
overstated by at least $76,500 (the amount from the $81,000 wire transfer immediately used to
pay for the ewes' acquisition).  Though this is not an important fact for purposes of Debtors'
eligibility, which under the Code focuses on gross income in 2010 rather than 2011, it does raise
serious, unresolved issues with the probative value and weight to be given the tax returns and to
Debtors' assertions in their summaries and testimony.

[33]   Debtors' budget projections, Ex. 100, indicate Debtors also have possession of 2 to 3
dozen cows, and roughly 20 calves, all owned by Peggy Marek on the same 70%-30% share
basis.  This budget also asserts Debtors "traded yardage and pasture for such animals in
December, 2011."

MEMORANDUM OF DECISION - 20

newly "leased ground."[34]

The only written contract reflecting a "shared gain" arrangement is Ex. 114, the agreement between Mr. Marek and Peggy Marek executed on May 1, one week before the hearing.  Mr. Marek testified that there were 600 ewes located on leased ground that Debtors controlled.[35]  The "lamb crop" from these ewes was, he said, 170%, with 150-160% considered a "good" crop.  A 170% lamb crop on 600 ewes would be approximately 1020 lambs.  Mr. Marek stated that only lambs, not ewes, would be sold.  In Debtors' proposed budget, Ex. 100, there is a reference to 700 lambs in existence as of May, 2012, and Mr. Marek indicated this was a figure representing Debtors' interest based on the 70% "share" of total lambs.

Lamb sales are projected to occur in August and October, which Mr. Marek testified are optimum market times.  It is the need to capture income from an October sale that Debtors suggest justifies a plan term exceeding three years.[36]

**DISCUSSION AND DISPOSITION**

Chapter 12 was designed to give "family farmers" an opportunity to

---

[34]  Mr. Marek testified that Debtors had obtained a "new" May, 2012, lease of approximately 100 acres from Peggy Marek, and that another lease of more than 100 acres existed "three miles up the creek" with another individual who he refused to name.  The latter lease, apparently also post-petition, required a $7,500 payment which Mr. Marek said he paid in April, 2012.

[35]  He also testified that he "put the deal together" for Peggy Marek to buy the sheep and simultaneously "lease" them (on the "shared gain") to Debtors.

[36]  *See* § 1222(c) (except as provided in § 1222(b)(5) and (9), a chapter 12 plan cannot provide for payments over a period longer than three years unless the court for cause approves a longer period).

MEMORANDUM OF DECISION - 21

reorganize under a special chapter of the Code, free from many of the provisions

of chapter 11 that could hamper such a reorganization.  It was initially enacted as

emergency legislation in response to the agricultural crisis of the mid-1980's.  *See*

*generally* 8 Collier on Bankruptcy ¶ 1200.1[2] (Alan N. Resnick & Henry J.

Sommer eds., 16th ed. 2010) (hereafter "Collier").

Even though so intended or designed, a recent decision of the Supreme

Court reflects that the plain language of chapter 12's provisions is controlling,

even if viewed by some as inimical to the policy of promoting a family farmers'

reorganization.  *Hall v. United States*, 132 S.Ct. 1882 (2012), *aff'g* 617 F.3d 1161

(9th Cir. 2010).[37]  The Dismissal Motion here tasks the Court with evaluating and

applying several express provisions of the Code.

### A.     Dismissal under § 1208(c)(3)

Killgore's Dismissal Motion accurately notes that, under § 1208(c)(3),

"cause" to dismiss a chapter 12 case includes a debtor's failure to file the initial

plan by the deadline established in § 1221, *i.e.*, 90 days after the order for relief.

The standard under § 1221 for the filing of a plan is a strict one.  As a

leading treatise notes:

> [T]he 90-day limitation [in § 1221] was probably included in chapter
> 12 for the benefit of creditors rather than for the benefit of the debtor.
> Because chapter 12 lacks the safeguards for creditors that are provided
> in chapter 11, the 90-day limitation, together with the 45-day limitation
> of section 1224, is the primary protection for creditors against a

---

[37]  *Accord Lamie v. U.S. Tr.*, 540 U.S. 526, 534-38, 542 (2004).

MEMORANDUM OF DECISION - 22

> debtor's languishing in chapter 12 without confirming a plan. Thus, it
> is appropriate that the debtor should be required to meet a stringent
> burden if the debtor seeks an extension of the 90-day period. The court
> should allow an extension only if the debtor clearly demonstrates that
> the debtor's inability to file a plan is due to circumstances that are
> beyond the debtor's control.

Collier ¶ 1221.01[2], at 1221-3 (footnotes omitted).

This Court has previously noted the firmness of the 90-day plan filing requirement. *See In re Blele*, 03.1 I.B.C.R. 85, 85-86 (Bankr. D. Idaho 2003).[38] But it does not require a wealth of decisional law to address the issue here presented; the Code's terms are sufficiently plain and clear.

Under § 1221, the debtor "*shall* file a plan not later than 90 days after the order for relief[.]" This language is not reasonably subject to debate. The section allows, however, for the possibility of an extension "if the need for an extension is attributable to circumstances for which the debtor should not justly be held accountable." This phrasing replaced a prior version of § 1221 that allowed for an extension of the plan filing deadline if "substantially justified." *See* Collier ¶ 1221.01[2] at 1221-2 (referencing 1993 amendments).

Debtors failed to meet the statutory deadline. And Debtors here made no § 1221 request for extension of that deadline. Their "objection" to dismissal

---

[38] The chapter 12 case in *Blele* was ultimately dismissed for cause under § 1208(c)(1) (addressing "unreasonable delay") based on that debtor's conduct, including failure to meet the confirmation hearing timing requirements of § 1224. However, the Court also discussed § 1221 (and implicitly § 1208(c)(3)), even though it was "not the basis relied upon by the Court for dismissing the case in this instance." *Id.* at 85.

instead argued (a) their Trustee allowed them until December 21 to file their plan[39]

and (b) Killgore was required to show prejudice from the delay.

The first argument is readily addressed.  The ability to extend the deadline

requires a ruling by *the Court*, and even then only if it finds that the inability to

timely file the plan is due to circumstances for which the debtors should not justly

be held accountable.  *See* § 1221 ("except that *the court* may extend . . .").

Nothing suggests the decision is one for the Trustee.[40]

The second argument is similarly unpersuasive.  There is nothing in the

language of § 1221 that requires the Court to find a creditor prejudiced by the

delay.  Nor is the Court required to engage in any analysis beyond determining if

the need for delay is "attributable to circumstances for which the debtor should not

justly be held accountable."  Debtors have failed to direct the Court to any

authorities supporting their contention, and the Court has not, in independent

research, found any.

While § 1221 is written in mandatory terms, § 1208 is permissively phrased

---

[39]  Trustee never addressed this allegation in his submissions, and the Court has no
evidence that there was such an agreement.  Even assuming it was an accurate representation,
Debtors failed to meet the terms of the agreement they say was struck.  Their plan was filed on
December 23, not December 21.

[40]  Section 1221 does not say who is to seek the extension, though it seems self-evident
that it would ordinarily be the debtor.  In the absence of any language of prohibition, a chapter 12
trustee arguably could request an extension and attempt to show why he feels the requisite
statutory grounds are met.  But being able to make a motion is a far cry from the chapter 12
trustee being able to grant the extension.  Debtors' reliance on the idea that the chapter 12 trustee
has that power is taken at their peril.  *Accord Blele*, 03.1 I.B.C.R. at 86 (rejecting debtors'
argument that deputy clerk of court's advice excused compliance with § 1221).

MEMORANDUM OF DECISION - 24

– the court "may dismiss" for cause.  This might suggest Debtors could seek to establish, even at a relatively late date, the "circumstances for which [they] should not justly be held accountable" in order to persuade the Court, in its discretion, to conclude there is not sufficient "cause" to dismiss.  They have not done so.[41]

The Court finds Killgore's Dismissal Motion alleging cause under § 1208(c)(3) is well taken, and it will be granted.

### B. Dismissal for "cause" under § 1208(c) based on lack of eligibility

Under § 109(f), only a "family farmer or family fisherman" with regular annual income may be a debtor under chapter 12.  Section 101(19) provides: "The term 'family farmer with regular annual income' means family farmer whose annual income is sufficiently stable and regular to enable such family farmer to make payments under a plan under chapter 12 of this title."[42]  In turn, "family farmer" is defined by the Code to mean:

> individual or individual and spouse engaged in a farming operation whose aggregate debts do not exceed $3,792,650 and not less than 50 percent of whose aggregate noncontingent, liquidated debts (excluding

---

[41]   That the Court on February 7 ordered, *inter alia*, an amended plan filed by March 13 was not tantamount to a ruling that Debtors had established cause for, or were granted, an extension of the § 1221 bar date.  *Accord Blele*, 03.1 I.B.C.R. at 85 (holding that the Court's approval of a stipulation of the parties regarding the filing of a proposed plan did not constitute a ruling under § 1221 excusing the failure to timely file the initial plan or excusing the failure of debtors to appropriately seek an extension).  In point of fact, the February 7 ruling made clear that all dismissal issues raised by Killgore would also be heard on May 8, and Killgore promptly filed its (Second) Dismissal Motion and noticed it for such hearing.

[42]   The aspect of this definition that relates to sufficiently regular and stable annual income is also at issue, and relates to whether Debtors proved their plan was "feasible" under the requirements of § 1225(a)(6).  The Court *infra* concludes Debtors did not establish feasibility under § 1225(a)(6), and that failure impacts this aspect of § 101(19) as well.

MEMORANDUM OF DECISION - 25

a debt for the principal residence of such individual or such individual and spouse unless such debt arises out of a farming operation), on the date the case is filed, arise out of a farming operation owned or operated by such individual or such individual and spouse, and such individual or such individual and spouse receive from such farming operation more than 50 percent of such individual's or such individual and spouse's gross income for –

(i) the taxable year preceding; or
(ii) each of the 2d and 3d taxable years preceding the taxable year in which the case concerning such individual or such individual and spouse was filed[.]

§ 101(18)(A).  As used here, "farming operation" includes "farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state."  *See* § 101(21).

The aggregate debt ceiling in § 101(18)(A) is not implicated.  Debtors' total debts are substantially below the cap.  The second aspect of the debt requirement – that not less than 50% of noncontingent, liquidated debts on the date of filing arise from a farming operation, has not been challenged by Creditors.  The balance of the eligibility provisions are disputed.

### 1.    Farming operation

The Code requires that chapter 12 debtors be engaged in a "farming operation" on the date of filing.  *See In re Nelson*, 291 B.R. 861, 870-71 (Bankr. D. Idaho 2003) (discussing § 101(18)(A)); *see also* 2 Collier ¶ 101.18[2] at 101-

MEMORANDUM OF DECISION - 26

101, ¶ 101.18[4] at 101-103.[43]  This Court has previously addressed at length the

"farming operation" component of chapter 12 eligibility.  *Nelson*, 291 B.R. at 867-

71; *In re Biggs*, 91 I.B.C.R. 139, 139-40 (Bankr. D. Idaho 1991).  A farming

operation would include activities such as those here, where Debtors raise sheep

and lambs on a "share" basis, and through which Debtors bear some risk related to

their skills and efforts at animal husbandry.[44]  However, as mentioned earlier,

Debtors' "trucking" income is not so easily categorized.  First, there is a signal

difference between trucking livestock Debtors raise or assist in raising and getting

such livestock to market, and trucking that is essentially hired transport of animals

belonging to another where there is no such "share" arrangement.[45]

The evidence regarding the precise details or parameters of the "farming

operation" as of September 2, 2011, is muddy.  However, both Debtors testified as

to the existence of some sheep raising activity at the time of filing.  Debtors' 2011

---

[43]  If the case is filed by individuals, then the farming operation must also be conducted
by the individuals.  2 Collier ¶ 101.18[2] at 101-101.  Here, the Court has concluded that the
occasional references to YO Livestock, LLC, do not require recognition of that entity as more
than a "dba" for Debtors' personal business activities and operations.  *Supra* note 6.

[44]  Not only do Debtors share in the profit or loss along with the owner of the breeding
ewes, they are responsible for care of the livestock, and their share is subject to diminution in the
event of excessive mortality.

[45]  In the former situation, trucking would appear to be an *expense*, not income.  The
testimony regarding the share arrangements did not clarify how this expense would be handled.
And neither did the only contract document, the May 1, 2012 Peggy Marek agreement, Ex. 114.
In the latter situation, *i.e.*, hauling livestock owned by others, one would expect Debtors to be
"paid" by someone for the trucking services they provide.  Tax returns and Debtors' summaries
suggest substantial "income" was paid to them, presumptively from trucking in this latter sense.
Debtors have even conceded they received both "Ag" income and "non-Ag" income.  *See also*
Doc. No. 72 at 2 (Debtors' brief, explaining that their use of the term "trucking" in their
summaries "is generally hauling for others").

MEMORANDUM OF DECISION - 27

income summaries show several "sheep sales" throughout 2011, including in

August and September.[46]  And the monthly operating report for September, 2011,

Ex. 102, reflects livestock sales on September 7 and 13, supporting the proposition

that Debtors were actively engaged in farming operations on the September 2

filing date.[47]  The Court finds this aspect of the eligibility requirement is met.

### 2.      Majority of income in prior taxable year

Congress chose, in enacting § 101(18)(A), to impose several requirements

on those who would file for chapter 12 relief.  Indeed, the Bankruptcy Appellate

Panel noted that "Congress has defined and limited eligibility to file a chapter 12

petition in such a fashion as to exclude some who appear to be family farmers in

the lay sense of the phrase.  That is the prerogative of the legislature."  *Quintana v.*

*Internal Revenue Service (In re Quintana)*, 107 B.R. 234, 241 (9th Cir. BAP 1989)

(addressing the debt-ceiling limitation).

Engaging in a farming operation at the time of filing is not alone sufficient.

---

[46]   The Court appreciates that it has found the largest August, 2011 "sheep sale" to be
something else entirely.  However, the questioning and documentary evidence did not generally
impeach the idea of Debtors' active involvement in raising sheep and lambs immediately before
and at the time of filing, even if the income from the August sheep sales was vastly overstated.

[47]   That monthly operating report shows $5,534.40 in livestock sales and $12,264.50 in
"trucking" in September.  However, the inquiry at this particular point is the existence of a
farming operation at filing, not its magnitude as compared to non-farming activities.  *Accord
Nelson*, 291 B.R. at 869 (noting that § 101(18) requires a review of tax returns for the taxable
year preceding the year of filing and determination of whether gross income from farming
operations exceed other gross income, and that the phrase "engaged in a farming operation . . . on
the date the case is filed" focuses on the status as a family farmer on the petition date, an analysis
that "bridges the gap between a potential Chapter 12 debtor's activities at the end of the prior year
and the time of filing in the current year").

Congress also required, in § 101(18)(A), that a chapter 12 debtor establish gross

income from farming operations constituted more than 50% of total gross income

in one of two relevant periods – either the taxable year preceding the year of

filing, or the 2nd and 3rd taxable years preceding the year of filing.

The issue here revolves around the 2010 tax year – the taxable year

preceding the year in which Debtors filed their case.[48]  The 2010 tax return

completed and provided to Debtors just two weeks after the case was filed,

showed schedule C gross income of $40,616.  There was no schedule F, and no

farm income asserted at any place in this return.  Ex. 208.  Debtors inserted the

gross sales figure from the original schedule C, $49,654, in their sworn response

to question 1 on their amended October SOFA.  Ex. 201.  However, the amended

2010 return, Ex. 109, lists gross non-farm income of $18,218 and gross farm

income of $46,813.

The amended return was prepared on limited data.  The agreement of the

parties under which Ex. 109 was admitted established that the preparer was

provided only Debtors' summaries, and not the binder or any underlying

transactional documents.  The amended return has limited inherent weight or

---

[48]   Debtors' 2009 tax return showed gross income was $236,978, all of which was shown
as nonbusiness income, and there was no schedule F nor any indication of farm income in
the return.  *See* Ex. 209.  Debtors' 2008 tax return showed gross nonfarm business income of
$136,396 and schedule F gross farm income of $47,033.  Debtors presented no other evidence in
connection with these two tax years.  Debtors therefore did not meet the alternative showing of
more than 50% of their gross income having been received from a farming operation in each of
the 2nd and 3rd taxable years preceding the taxable year in which the case was filed.  *See*
§ 101(18)(A)(ii).  The focus, therefore, is solely on 2010 as "the taxable year preceding . . . the
taxable year in which the case . . . was filed" under § 101(18)(A)(i).

MEMORANDUM OF DECISION - 29

probative value.

In this sense, the preparer was treated in the same manner as Creditors, Trustee and the Court, in that nothing was provided to corroborate Debtors' summary assertions as to how much income they received in 2010 and from where it was derived. Especially in the context of a hotly contested eligibility dispute – not to mention one in which Debtors shift from a SOFA and tax return assertion that disqualifies them from chapter 12 relief to an amended return assertion that would meet the standards of § 101(18)(A)(i) – the refusal to provide any documentation or testimonial detail is unreasonable. And when evidence is introduced, such as that in regard to the significantly overstated farm income in August, 2011, questions are reasonably raised as to the veracity of similar assertions related to events in 2010.

Debtors counter with the idea that disclosure of facts and details regarding their business dealings exposes them to some undefined (but, they say, real) threat of injury from Mrs. Killgore. Several problems attend this defense. First, the allegation of the existence of a credible threat of injury in this chapter 12 case is vague and unsubstantiated. It ultimately relied on a description of one instance of Mrs. Killgore's comments in 2010 at a cattle sale.[49]

Second, even if the fear of injury from full disclosure was credibly

---

[49]  The exact comments are not before the Court. But that Mrs. Killgore may have had unkind things to say about Debtors in 2010 is not necessarily surprising, given that Killgore brought suit in 2009 against Debtors for fraud related to longhorn cattle. That suit resulted in judgment in 2011.

MEMORANDUM OF DECISION - 30

founded, Debtors could have sought relief – for example, through protective orders[50]– that would have allowed them to meet their obligations to respond to the document production requirement and to testify at the Rule 2004 examination and the § 341(a) meeting.[51]  Proactively addressing the issue in such ways would assist Debtors in facing the practical challenge of establishing eligibility and proving they had a feasible chapter 12 plan proposed in good faith.  They instead refused to provide any underlying documents or details to corroborate or support their bare, conclusory assertions, and chose to selectively answer questions of Creditors and Trustee.

The weight of the credible and probative evidence establishes that Debtors fail the 50% farm income requirement of § 101(18)(A)(i).  Lack of statutory eligibility is "cause" for dismissal of the case.  *Quintana*, 107 B.R. at 240-41 (dismissal of chapter 12 case for failure to meet § 109(f)); *Biggs*, 91 I.B.C.R. at

---

[50]  Federal Rule of Civil Procedure 26(c) is incorporated by Fed. R. Bankr. P. 7026, and that Rule is applicable in contested matters such as this pursuant to Fed. R. Bankr. P. 9014(c).

[51]  Debtors' counsel, in briefing and argument, points out that Creditors could have sought an order compelling production of documents or testimony at the Rule 2004 examination. The Court finds that unpersuasive.  First, in a "stand-off" situation such as this where Debtors fail to produce relevant documents or answer relevant questions, they assume the risk that the evidentiary void will operate to their detriment.  Second, motions to compel discovery are addressed in Fed. R. Civ. P. 37, incorporated under Fed. R. Bankr. P. 7037, and applicable in this contested matter under Fed. R. Bankr. P. 9014(c).  Civil Rule 37(a) addresses a process where, if discovery is not answered, a party may seek an "order" compelling response.  The parties here, in connection with the Rule 2004 examination, had already agreed to entry of an order which specifically required production of documents.  *See* Ex. 204 at 2.  The order was entered on express stipulation.  Ex. 203 at 2 ("The parties agree that the Court may issue an order for the production of the following documents by debtor at the examination[.]").  An additional order "to produce" would be redundant, and Creditors' pursuit of relief under Civil Rule 37 would presumptively be solely for sanctions.

MEMORANDUM OF DECISION - 31

141 (same); *accord In re Boise County*, 465 B.R. 156 (Bankr. D. Idaho 2011)

(dismissal of chapter 11 case for failure to meet § 109(c)); *In re Ruckdaschel*, 364

B.R. 724 (Bankr. D. Idaho 2007) (dismissal of chapter 7 case for failure to meet

§ 109(h)).[52]

Creditors have established, by a preponderance of the evidence, that

Debtors are not eligible to be chapter 12 debtors.  The Dismissal Motion will

therefore be granted on this basis as well.

### C.   Denial of confirmation

The Court has found Debtors ineligible for chapter 12 relief and, if eligible,

that they failed to comply with the Code's deadline for filing an initial chapter 12

plan or to request and justify an extension of that deadline.  Thus Debtors have

failed to comply with all chapter and Code requirements.  *See* § 1225(a)(1).

Confirmation will therefore be denied.[53]

---

[52]  *Boise County* observed that the burden is on the debtor to establish eligibility.  465
B.R. at 167 (citing *Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo)*,
408 B.R. 280, 289 (9th Cir. BAP 2009)).  *Ruckdaschel* recognized that the
language of § 109(h)(1) is "specific and precise" in establishing a condition of eligibility (*i.e.*,
prebankruptcy credit counseling for individual consumer debtors) and by reason of such language
"[t]he Court must therefore presume that Congress intended no . . . license for discretion."  364
B.R. at 733.  *Ruckdaschel* also addressed the proposition that dismissal, there under § 707(a), was
arguably discretionary because of its language, *i.e.*, that the Court "*may* dismiss."  It found,
however, that this did not authorize the Court to ignore the eligibility requirements:  "[E]ven if
§ 109(h) does not clearly require dismissal, Debtors are given no safe haven . . . .  That Debtors
are not eligible for relief undoubtedly constitutes adequate cause for dismissal . . . .  The Court
cannot in good conscience presume that because Congress allows for dismissal for cause in
§ 707(a), but does not command it, that it intended bankruptcy judges to override the specific
instructions provided in § 109(h) concerning who may be a debtor in a bankruptcy case."  *Id.* at
733 n.13.

[53]  The plan properly before the Court for confirmation is that of March 13, 2012, Doc.
(continued...)

MEMORANDUM OF DECISION - 32

Creditors raise further objections to confirmation.  They contend Debtors

failed to meet the feasibility standard contained in § 1225(a)(6).[54]  Trustee in

closing argument also recommended denial of confirmation on this ground,

arguing Debtors' projections were unreasonably "speculative" and "unrealistically

optimistic," and predicated on ill-defined and unenforceable commitments from

Peggy Marek.

In addition to Trustee's concern, feasibility of the plan rests upon income to

be generated from "share" arrangements with individuals other than Peggy Marek.

But Debtors refused to divulge the identity of such individuals or the details of the

arrangements.  In addition to the other concerns this lack of disclosure raises,

some of which have already been identified above, Debtors' plan requires income

generation that is substantially greater than any income ever realized by Debtors

from farming and non-farming operations combined.  Creditors argue that credible

detail of the existing share arrangements is necessary to establish feasibility, even

in the first year of the plan.

---

[53] (...continued)
No. 54.  Debtors also filed, but improperly noticed, an amended plan on May 3, Doc. No. 83.
The Court's denial of confirmation will relate to both plans.

[54]  Debtors bear the burden of demonstrating their plan is feasible.  *See, e.g., In re Yett*,
03.2 I.B.C.R. 122, 125, 2003 WL 25273832 (Bankr. D. Idaho 2003), *In re Stallings*, 290 B.R.
777, 790-91, 03.1 I.B.C.R. 77, 83 (Bankr. D. Idaho 2003); *In re McIntyre*, 95 I.B.C.R. 202, 206,
1995 WL 495128 (Bankr. D. Idaho 1995).  While Debtors must show they "will be able to make
all payments under the plan and to comply with the plan" per § 1225(a)(6), "[t]he debtor is not
required to guarantee the ultimate success of his plan, but only to provide a reasonable assurance
that the plan can be effectuated."  *Stallings,* 290 B.R. at 791 (quoting *Millar v. Nauman (In re
Nauman)*, 213 B.R. 355, 358 (9th Cir. BAP 1997)).

MEMORANDUM OF DECISION - 33

The Court agrees.  The evidence, as a whole, does not support Debtors'
projections and the contentions that they can fund the proposed plan.  Debtors did
not show that such increases in their ability to generate income were reasonably
likely to occur.  They failed to carry their burden under § 1225(a)(6).

Confirmation of the plan also requires the Court find Debtors' plan "has
been proposed in good faith."  *See* § 1225(a)(3).  This standard was explained by
this Court in *Nelson*, 291 B.R. at 865-66.  Among other things, the plan must
"achieve a result consistent with the objectives and purposes of the Bankruptcy
Code," and it should be "reviewed for 'fundamental fairness' in dealing with
creditors' claims[.]"  *Id.*  The authorities relevant to good faith in chapter 12
"generally line up with [those] interpreting the good faith required in the Chapter
13 context under 11 U.S.C. § 1325(a)(3)."  *Id.*  These requirements "prevent[]
confirmation of plans proposed by those who are dishonest with the court or
creditors, uncooperative, inequitable in their dealings, or who attempt to
manipulate the bankruptcy process."  *Id.*

Debtors' approach to the disclosure of the financial details of their
prebankruptcy and post-bankruptcy business operations, both in failing to produce
documents and refusing to answer questions about the parties with whom they did
(or do) business and on what terms or basis, is behavior that is at the very least
uncooperative and inequitable.  Moreover, such an approach does not provide
fundamental fairness in dealing with creditors' claims or the bankruptcy process.

MEMORANDUM OF DECISION - 34

Debtors cannot gain the several benefits that chapter 12 provides, but refuse to make the open and complete disclosures that are *quid pro quo* for receiving such benefits.  To attempt to shield relevant financial details while at the same time seeking to impose on creditors a plan purportedly based on such details is a manifestation of a lack of good faith.  The Court finds this objection to confirmation is also well taken.

Because Debtors failed to meet their burden to establish compliance with § 1225(a)(1), (3) and (6), confirmation will be denied.[55]

### D.      Dismissal under § 1208(c)(5)

Dismissal is sought by Creditors under § 1208(c)(5), which provides that cause for dismissal includes denial of confirmation under § 1225 and denial of a request for additional time to file another plan.

Debtors requested, in closing argument on May 16, leave to file an amended plan.  Such leave to amend is inappropriate where, as herein concluded, Debtors are ineligible for chapter 12 relief under § 109(f) and where an unexcused failure to timely file an initial plan exists under § 1208(c)(3) and § 1221.  Thus, dismissal is also appropriate under § 1208(c)(5).  *See Biggs*, 91 I.B.C.R. at 141 (denying confirmation because debtors were ineligible for relief under chapter 12 and concluding that, given such ineligibility, there was no reason to allow further

---

[55]   Under the circumstances, the Court will not address other contentions related to confirmation.

MEMORANDUM OF DECISION - 35

amendments to the plan and that dismissal under § 1208(c)(5) was warranted).

**CONCLUSION**

Confirmation of Debtors' chapter 12 plan will be denied.  Creditors'
Dismissal Motion shall be granted, and this case dismissed.  The Court will enter
an Order upon this Decision.

DATED:  June 13, 2012

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 36